## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 16 2018, 7:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Steven E. Ripstra
Jacob P. Wahl
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

M.B.-L. and R.B. (Minor Children)

and,

J.B. (Mother)

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

February 16, 2018

Court of Appeals Case No.
19A01-1707-JT-1577

Appeal from the Dubois Circuit Court

The Honorable Nathan Verkamp, Judge

Trial Court Cause Nos.
19C01-1701-JT-5
19C01-1701-JT-6

**Barnes, Judge.**

# Case Summary

J.B. ("Mother") appeals the termination of her parental relationship with her children, M.B. and R.B.[1] We affirm.

# Issue

The sole issue before us is whether there is sufficient evidence to support the termination of Mother's parental rights.

# Facts

Mother gave birth to M.B. in January 2014 and R.B. in September 2014. On May 17, 2015, the DuBois County Office of the Department of Child Services ("DCS") removed the children from Mother's care on an emergency basis due to allegations of physical abuse and neglect. Investigators observed that M.B. and R.B. had acute diaper rash and scabies. R.B., who has significant medical issues due to his premature birth, was extremely thin and appeared malnourished; he also had contusions on his face, head, hands, and leg.

On May 19, 2015, DCS filed petitions alleging that M.B. and R.B. were children in need of services ("CHINS"). The trial court adjudicated the children as CHINS on July 30, 2015. On August 28, 2015, the trial court

---

[1] The children's father's parental rights were also terminated; he is not a party to this appeal.

ordered the children removed from Mother's care and granted wardship to DCS pursuant to a dispositional decree. Under the DCS's case plan, Mother was to maintain weekly contact with her family case manager and to participate in recommended services, including parent aide services, individual therapy, and supervised visitation sessions.

On January 23, 2017, DCS filed verified petitions for involuntary termination of Mother's parental rights. The trial court conducted a fact-finding hearing on April 12, 2017. Family Case Manager Supervisor Shannon Blaize testified that she investigated the allegations of physical abuse and neglect in May 2015. She testified,

> R.B. had multiple contusions to the right side of his head, his left eye, bridge of nose, behind his right ear, both of his hands, and his left leg. He also had a child-sized bite mark on the right side of his back. Both the boys had significant diaper rash along with a lot of dirt underneath their fingernails.

Tr. p. 10. Blaize testified further that R.B. had reportedly suffered the contusions while Mother was asleep, likely at the hands of Mother's nephew. Blaize testified that when she asked Mother about the children's health conditions, Mother responded that "there were no concerns." *Id*. at 11.

Former DCS Family Case Manager Jessica Wilson testified that, at the beginning of the case, the condition of Mother's house was

> extremely smoky, extremely dirty, all of that. Then it had improved greatly. Then they got cats . . . and it wasn't being cleaned. And so it got pretty bad again, and so that's when we

had switched visits to a different location until she would get that stuff cleaned up. And then it did get cleaned up, and we had started visits back at the house again.

*Id*. at 56.

> [Visitation] went from supervised to monitored, but then there was some bruising that was found on [R.B.]. And it could not be said for sure where the bruising was coming from, so it was recommended from DCS to move back to supervised just to see then, like, if they're normal bruises that come from children just being children then we would see those continue. But if it was something that had to do with the safety of the children, then that would stop. And so we went back to supervised visits, and then at that point it remained at supervised until I had left.
>
> Q: And had the bruises stopped?
>
> A: . . . . Whenever we went back to supervised, then the bruising had stopped, yes.

*Id*. at 41. Wilson also testified that, during a supervised visit, Mother and her then-boyfriend

> went outside to smoke and were just going to leave the kids in the house unsupervised. And so then that was addressed about how that wouldn't be appropriate.

*Id*. at 43. Wilson testified that, although Mother initially cooperated with services, she was unable to maintain her progress after her work schedule changed; "[Mother] was having trouble balancing the sleep and everything. So

then she wasn't attending the visits and she wasn't making the appointments." *Id*. at 46.

[7] Wilson testified further that, at the beginning of the case, Mother was receiving parent aide services. She testified that Mother participated well initially, but her efforts waned "because she had received a job and she was oversleeping or she was asleep and didn't wake up for the door, things of that nature." *Id*. at 42. Lastly, regarding a mental health assessment of Mother, Wilson testified:

> . . .[W]hat I can remember is that due to maturity – like they said that she seemed not to have an understanding of what is realistic for a child, like what is safe versus was is not safe. And like even with her sleeping habits, what is realistic as far as how much sleep one would need in order to be able to properly supervise her children.

*Id*. at 52.

[8] Paul Minn ("Minn") and his wife were the children's foster parents immediately after removal. Minn testified that that M.B. and R.B. were his wards from May 2015 through September 2016, when the children were moved to their pre-adoptive home. He testified that the children arrived in extremely poor condition with skin infections. He testified further that "[R.B.] had marks and so forth on him"; and "he was very, very thin." *Id*. at 95. He added,

> [R.B.] was just nearly emaciated. He just seemed terribly malnourished, his ribs showing and, you know, his back bones sticking up through his skin. His face was all sunk in. His eyes were kind of bulging. . . .[H]e just didn't look like a normal [child].

*Id*. Minn testified that M.B. appeared developmentally delayed, and "was not walking yet." *Id*. He testified that "[w]ithin a few weeks of being with us, [M.B.] started walking. We just gave him some encouragement and, you know, . . . he was doing good." *Id*. at 96. Minn testified that in time, "[the children] kind of came around" under the Minns's care. *Id*. at 96. The Minns "got [R.B.] back involved with" his nutritional specialist, who prescribed a special formula for him, "[a]nd he started, you know, fattening up and filling out . . . and, you know, seemed to act and look more like a normal infant." *Id*. Minn testified that Mother had "just quit" taking R.B. to his appointments with the nutritional specialist and neonatologist. *Id*. at 97.

[9]   Minn testified that he and his wife had to transport R.B. to appointments with medical specialists located throughout the state. He testified further that the children each were delayed in achieving developmental milestones: "I know [R.B.] had a physical therapist and [M.B.] had a developmental therapist that would come and work with them on things that they probably should have already been – you know, had a grasp on." *Id*. at 99.

[10]   Minn also testified that, in addition to the nutritional specialist and the neonatologist, R.B. also sees a pulmonologist for his lung issues. He testified,

> His breathing was always an issue. And in fact, the
> pulmonologist informed us that, you know, obviously, you
> know, he couldn't be around cigarette smoke. But he said – he
> had told us that even the – if you're not smoking around the kid
> but you're a smoker and it's in your carpet or, you know, on your

couch or on your clothes, it's still just as detrimental . . . to a
child, I mean, particularly one that's very sensitive to that.

*Id*. at 99. Minn testified that after, visits with Mother, the children occasionally returned smelling of cigarette smoke, dirty, and/or presented with questionable injuries on R.B. Minn also testified that, following the children's visits with Mother, his home became infested with bedbugs and he contracted a "C.Diff"[2] infection. *Id*. at 101. Lastly, Minn testified that, when the children left his home for their pre-adoptive home,

> [They] had developed into completely different kids. . . . They
> were happy and outgoing. [R.B.] had started walking, speaking a
> few words. They both seemed very healthy. I mean, they had
> gotten – you know, gotten all the nurturing and nutrition that,
> you know, we could give them that they needed. In fact, that's
> what the . . . neonatologist, he said, you know, he just couldn't
> believe the improvements. And he said that nurture was just as
> important as nutrition.

*Id*. at 102.

[11] Janice Williams of Ireland Home Based Services testified that she assisted Mother's reunification efforts by providing intensive services in the areas of housing, employment, parenting, and meeting the children's basic needs. Williams testified that Mother lacked housing and employment when she began

---

[2] Clostridium difficil, or "C.Diff," is a bacterial infection of the colon that can be contracted in unsanitary conditions.

receiving services. She testified that, although Mother succeeded in securing a job, she "had trouble waking up," and "[s]he had a problem remembering appointments and things she was supposed to do . . . ." *Id*. at 17. She testified that she had a recurring concern regarding Mother's inability to moderate her sleep: "At times they were sleeping whenever I would arrive. . . . Like [Mother] had admitted she had problems waking up . . . ." *Id*. at 19, 22. Williams testified further that, under the Homebuilders program, "the children have to be returned within a month or we close services." *Id*. at 23. She testified that, although the majority of program participants successfully achieve reunification, Mother showed "[n]ot really significant progress" and was discharged as "not successful." *Id*. at 20, 21.

[12] Home-based family caseworker Bethany Glazebrook, who supervised Mother's parenting time from July 2015 through July 2016, testified that "[they] work[ed] on parenting skills" and on "[w]hat the children should accomplish for their age[s], like the walking, the talking, their development." *Id*. at 62. She testified that Mother was receptive to services but was inconsistent, cancelling seventeen of approximately one hundred and fifty visits, usually due to illness, oversleeping, and missing appointments.

[13] Heather Rockman-Boatman of Ireland Home Based Services testified that she provided supervised visits to Mother to help her with discipline, housing, employment, bonding, and positive interaction. She testified that Mother had "a lot of missed visits, so I can't say that there's consistency." *Id*. at 77. Mother failed on a few occasions to call ahead to confirm that she was going to

attend her scheduled visits, which resulted in the children being transported for visits that she did not attend. Rockman-Boatman also testified that the supervised visits occur in "a very controlled room so there's not a lot of concerns as far as safety" – a stark departure from the reality of parenting two young boys. *Id*. at 79.

[14] Kathleen Speedy, a case manager with Southern Hills Counseling Center, testified that she works with clients on "parenting skills, organizational skills, anxiety, [and] coping skills . . ." *Id*. at 84. She testified that, as Mother's parent aide, she met with her approximately two or three times each week. She testified that she observed a lack of consistency in supervised visits: "On those she had about 13 no-shows and a canceled -- call canceled by [Mother] in about ten of those." *Id*. at 85. Mother was ultimately discharged for poor attendance. Mother's program goals were obtaining her GED; getting her driver's license; securing safe housing; and improving her parenting and organization. Speedy testified that, at the time of the termination hearing, Mother had not obtained her GED or driver's license, and was living in an apartment that presented a safety concern. Mother was discharged having "not successfully completed" the program. *Id*. at 87.

[15] Kelly VanMeter, a staff therapist with Southern Hills Counseling Center, testified that she was Mother's individual therapist. She testified that Mother failed to follow up on her reunification goal "[a]s far as therapy with me . . . because she has missed more sessions than she has made sessions." *Id*. at 91.

She testified that, although she notified Mother in writing of the process for reinstatement, Mother failed to follow through.

[16] Hannah Cannon, a case manager with The Villages, a licensed child placement agency, testified that she worked with the Minns to establish "specific goals for the children for their development, cognitive functioning, speech, that type of thing." *Id*. at 105. As for the children's medical issues, Cannon testified that M.B. works with a speech therapist and "really doesn't have any specific medical needs." *Id*. at 106. She testified that R.B., however, has lung issues; gastrointestinal issues, including a milk protein allergy; must take formula because he has difficulty gaining weight; and sees a developmental therapist and a physical therapist.

[17] Ann Staff, the children's CASA throughout the entire CHINS period, testified that Mother "loves those boys," and that their relationship is "close" and "bonded." *Id*. at 132. However, she testified further that Mother "has trouble dealing with both of [the children] at the same time." *Id*. Asked whether she had "concerns for the boys if they are in Mother's care," Staff testified:

> I don't think that she is capable of raising the boys. I have concerns that she would be able to take care of them financially. Yes, she's been doing a great job about having a job and she continues, you know, to have a job. But having a job then means time away from the boys as well. And she doesn't have a good support system.
>
> It's not like she has family that she can rely on. She can't drive. She doesn't really want to drive. There are things that are

needed to take care of the boys, the doctor's visits. I mean, just the fact that it took so long to find a ride to the hospital when -- you know, when [R.B.] was initially injured. You know, she's young. She's very young. And I think she is growing. I think she is learning. I am happy that she is doing these things. But it's not to the level where I would feel comfortable having the boys reunited with her.

Q:     As the CASA, what would you have liked to have seen from Mother to facilitate reunification?

A:     Attending every visit. You know, the initial problem with her having the boys removed was the fact that she fell asleep and couldn't, you know, take care of them, you know, couldn't keep them safe. She continues to fall asleep. She misses visits because she can't get up in time. She does not keep appointments. She doesn't keep child and family team meetings because she doesn't write them down or she forgets or I don't know. They don't happen. She's just not responsible enough to take care of them.

*Id.* at 132-33. Staff also testified as follows that the children had made significant developmental strides in foster care:

[Upon removal, R.B.] didn't walk and he didn't talk. He grunted, but [made] very little communication whatsoever. And [R.B.], you know, coming out of the hospital was just, you know, very – he was sick. I mean, he was lethargic . . . . He was tired. But since then they really developed personalities. [M.B.] learned to walk, is speaking better.

[M.B.] is not to the level where he needs to be, but has improved greatly. [R.B.] couldn't even crawl. It mean, he – it was probably nine months ago he wasn't even – he was doing arm crawls and that was it. He's now walking and running and, you

know, talking and just – you know, they're happy. They're outgoing. They're growing rapidly. At the -- you know, at one of the team meetings the report on the doctor's visit, you know, it was great news to hear that [R.B.] would grow out of any of the issues that he's -- you know, was born with. And they're meeting more and more of their milestones. So they're catching up, especially [R.B.] catching up with his age level and [M.B.] with his developmental level.

*Id*. at. 135. Staff testified that her recommendation was that the "boys would be best suited where they are," and that adoption was in their best interest. *Id*. at 136.

[18] Former family case manager Stephanie Gilmour testified that she served as case manager for M.B. and R.B. from August 2016 to March 2017. She testified that Mother was not "consistent with participation" in parent aide services, individual counseling or therapy sessions, and supervised visitation; that Mother failed to do what was necessary for reunification; and that adoption was in the children's best interest. *Id*. at 145.

[19] Mother testified that she had a good relationship with R.B. and M.B. and acknowledged the following: (1) that she had not obtained her driver's license; (2) that she was "probably not up to date completely" regarding R.B.'s medical issues; (3) that she had failed to regularly comply with or to attend supervised visitations, meetings with her parent aide, and individual counseling; and (4) that she had recurring issues with punctuality, oversleeping, missing appointments, and unreliable transportation. She also testified that she "could [have] do[ne] more" to effect reunification with R.B. and M.B. *Id*. at 121.

On June 9, 2017, the trial court entered orders, containing extensive findings, for involuntary termination of Mother's parental relationship with M.B. and R.B. She now appeals.

## Analysis

Mother contends that there is insufficient evidence to support the termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.,* 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children,* 796 N.E.2d 280, 285 (Ind. 2003)). We recognize that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*). Courts need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 372 (Ind. Ct. App. 2006), *trans. denied.* "Rather, when the evidence shows that the emotional and physical

development of a child in need of services is threatened, termination of the parent-child relationship is appropriate." *Id.*

[22] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *I.A.,* 934 N.E.2d at 1132. We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Mother's parental rights, as required by Indiana Code Section 31-35-2-8(c). *See In re N.G.,* 61 N.E.3d 1263, 1265 (Ind. Ct. App. 2016). When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *I.A.,* 934 N.E.2d at 1132. We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[23] Indiana Code Section 31-35-2-8(a) provides that, "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the wellbeing of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1234 (Ind. 1992).

[24] Here, the trial court found that continuation of the parent-child relationships posed a threat to M.B. and R.B. Mother disputes that finding.[3] When considering whether there is sufficient evidence to support such a finding, trial

---

[3] Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS needed to prove only one of the requirements of subsection (B). We conclude there is sufficient evidence that continuation of the parent-child relationship posed a threat to M.B. and R.B.'s well-being and need not consider whether there is a reasonable probability that the conditions resulting in the children's removal from Mother's care would not be remedied. *See In re B.J.,* 879 N.E.2d 7, 20 (Ind. Ct. App. 2008).

courts must "consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 152 (Ind. 2005). "At the same time, however, a trial court should judge a parent's fitness to care for his [or her] child as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.*

[25] The trial court made extensive findings regarding Mother's inconsistency, lack of engagement, and unwillingness and/or inability to comply with DCS's case plan, including service providers' treatment plans regarding supervised visits, individual counseling, therapy sessions, and work with a parent aide, all of which were intended to aid her reunification efforts:

> 17. Mother and Father were to participate in recommended services by the Department.
>
> * * * * *
>
> 33. Mother was offered the opportunity to participate in parent aide services, individual therapy, and visitations.
>
> 34. Mother admits that she has not regularly met with her Parent Aide and is unable to remember the last time that she met with her Parent Aide.
>
> 35. Cathy Speedy of Southern Hills Counseling Center sent Mother a letter on February 22, 2017, explaining that because of her missed visits in order to continue with Parent Aide services Mother needed to attend a one (1) time group session.

36. Mother admits to receiving such letter, however has not attended the required group session.

37. Mother had missed ten (10) parent aide sessions. Specifically, Mother cancelled six (6) sessions and no showed four (4) sessions.

38. Mother has not made progress towards any of the goals set out for her.

39. Kelly VanMeter is the mother's individual therapist at Southern Hills Counseling center.

40. Since August 2016, Mother has had eleven (11) scheduled individual therapy sessions, however she has only completed five (5) sessions with the most recent occurring on January 4, 2017.

41. Mother was not on time for all five (5) therapy sessions she attended.

42. Mother has not made any progress with her individual therapy goals.

43. Mother admits that it is important to have counseling. However she missed counseling for various reasons.

44. Mother missed visitation for reasons such as "I missed the date and time" or "I didn't have a ride there."

45. Bethany Glazebrook supervised Mother's parenting time until December 2016.

46. Mother made progress when her parenting time was supervised from July 2015-July 2016. However Mother missed visits due to oversleeping and transportation issues.

47. Mother was occasionally not prepared for the visit due to being asleep when [Glazebrook] arrived at the home.

48. During visitations, one child would remain on her lap and Mother would care for the other child.

49. Mother was never able to interact with both children at the same time.

50. Heather Rockman-Boatman of Ireland Home Based Services testified that since December 2016, she has been the supervisor of parenting time.

51. Mother has been inconsistent in her visitation, as well as regularly ended visits early.

52. Heather Rockman-Boatman then began supervising parenting time in December 2016.

53. From December 2016 to March 2016, Mother was offered forty-one (41) visits and attended eighteen (18) visits.

54. Mother has a problem of sleeping through appointments and visits, as well as, is frequently late to scheduled appointments and visits.

55. Mother admits that she could have done more to reunify with [R.B. and M.B].

App. Vol. II pp. 9-11. The trial court also entered findings regarding Mother's unreliability, lack of a support system, and inability to meet either the children's basic needs or R.B.'s unique medical needs as follows:

56. Mother lacks transportation, appropriate housing, and consistent employment.

57. Mother, per her own admission, relies on friends for transportation and believes it's "probably not a good idea to get a license right now" due to her finances.

58. Mother's current home has had some work completed to make the home more appropriate for [the children]. However, at this time, and without certain items, the home is still not appropriate for children.

59. Mother acknowledges that six (6) months is her most consistent period of employment.

60. Mother acknowledges that DCS became involved in this matter when [M.B.] had severe diaper rash. [R.B.] sustained injuries in Mother's care while she was sleeping nearby.

61. Ann Staff, CASA, reports concerns about [the] length of time it took Mother to take [M.B.] and [R.B.] to the hospital when they were removed from the home.

62. [R.B.] has significant medical history due to being born premature and meets with different medical specialists.

63. Mother is not up to date on the current medical status of [R.B.].

64. Mother, at points in the case, made positive progress towards reunification. However, Mother moved back down to supervised visitations when [R.B.] returned from visits to Foster Care with unexplained bruises and other injuries.

65. Following a return to supervised visitations, the bruises ceased.

66. When [M.B.] and [R.B.] were placed in his home, [R.B.] had bruises and marks on him, was very thin, and looked malnourished.

67. When both children were placed in the home, they had severe diaper rash and scabies.

68. Paul McMinn acknowledged that [M.B.] and [R.B.] initially returned from visitations smelling of cigarette smoke and at one point brought bed bugs into his home.

69. [R.B.] is unable to be around cigarette smoke due to lung issues.

70. Mother admits that she smokes cigarettes, smoked cigarettes in the home, and knew that she needed to go outside to smoke cigarettes due to medical conditions of [R.B.].

71. Paul McMinn notes that from when [M.B.] and [R.B.] were placed in his care to when they left his care for new Foster placement, they were "completely different kids."

72. Based on parents' lack of progress and consistency, Former FCM, Stephanie Gilmour, as well as CASA, Ann Staff, testified that testified that adoption and termination of parental rights was in [M.B. and R.B.'s] best interests.

*Id.* at 11-12. We cannot say the foregoing findings, which reflect the trial court's weighing of the evidence and judging of witness credibility, are clearly erroneous.

[26] This case is made especially difficult because Mother's family case managers and service providers recognized her love for the children and actively worked to aid her efforts to reunite with M.B. and R.B. Sadly, they had a complacent partner in Mother, who failed to rise to the occasion despite receiving significant support. The children were removed from Mother's care because of allegations of physical abuse and neglect. The record reflects that Mother failed to appreciate the extent of her children's needs—especially R.B.'s—as well as the adverse impact of her chronic inconsistency and her inability to make necessary changes for their wellbeing.

[27] Family Case Manager Blaize testified that when she asked Mother about the children's medical issues, she responded that they had none. The record is clear that, at least at the outset of the CHINS period, M.B. required speech therapy; and R.B. required treatment from a host of medical specialists. Specifically, as to R.B.'s breathing problems, several witnesses testified that Mother continued to smoke during the CHINS period, despite warnings that he could simply not withstand it.

[28] Mother's decision to forgo obtaining a driver's license, which was vital to ensuring R.B.'s routine access to medical specialists as well as to emergency care, is troubling and reinforces CASA Staff's testimony that Mother is neither

"responsible," conscientious, nor "capable" of appropriately parenting M.B. and R.B. *Id.* at 132-33. Mother missed so many sessions with her individual therapist and parent aide that those service providers discharged her. Foster parent Minn testified that Mother had "just quit" taking R.B. to his appointments with his medical providers. *Id.* at 97. Her shoddy record of appointment no-shows and cancellations with her parenting aide, individual therapist, and even for supervised visits—at a time when she was pursuing reunification and receiving peak-level support—does not inspire confidence in her ability to self-govern had reunification occurred. Lastly, various witnesses testified to the remarkable turnaround made by each child once he was in a stable, nurturing environment with access to necessary services, treatment, and support.

[29] Given the children's youthful ages and R.B.'s medical challenges, it was incumbent upon Mother to demonstrate her desire, ability, and noted progress toward improving her attentiveness and supervision, management of R.B.'s medical appointments, and her ability to meet the children's basic needs so that they could achieve developmental milestones in her care as they did under the Minns's care. In light of the foregoing, we agree with the trial court that allowing continuation of Mother's parent-child relationships with M.B. and R.B. poses a threat to their wellbeing. The trial court's findings on this issue were not clearly erroneous.

[30] Mother also contends that termination is not in M.B. and R.B.'s best interests. When considering whether there is sufficient evidence that termination of

parental rights is in a child's best interests, we consider the totality of the evidence and look beyond the factors identified by DCS. *In re J.C.*, 994 N.E.2d 278, 289-90 (Ind. Ct. App. 2013). The interests of the parents must be subordinated to the needs of the child. *Id.* at 290. Recommendations of DCS caseworkers and court-appointed special advocates, combined with evidence that continuation of the parent-child relationship poses a threat to the child, are sufficient to prove by clear and convincing evidence that termination is in a child's best interests. *Id.* Children have a paramount need for permanency, which is a central consideration in evaluating a child's best interests. *In re E.M.*, 4 N.E.3d 636, 647-48 (Ind. 2014).

[31] The record reveals throughout that Mother failed to demonstrate the level of commitment and consistency necessary to assure DCS and service providers that she could meet M.B. and R.B.'s unique needs. Various witnesses testified that she simply lacked the will, maturity, and discipline to engage in services intended to improve her parenting, organizational, and coping skills. Although she made limited progress, the evidence overwhelmingly establishes that Mother failed to meet virtually all goals established for under DCS's case plan. Both the children's CASA and Family Case Manager recommended termination of Mother's parental rights and adoption in their foster placement. Given Mother's minimal progress and the genuine risk of harm to the children—particularly R.B.—from her complacency, it is unclear how long M.B. and R.B. would have to wait for those conditions to improve, if at all. We conclude that there is sufficient evidence to support the trial court's finding

that termination of Mother's parental rights was in M.B. and R.B.'s best interests.

# Conclusion

[32] There is sufficient evidence to sustain the termination of Mother's parental relationship with M.B. and R.B. We affirm.

Affirmed.

Najam, J., and Mathias, J., concur.